COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:    Judges AtLee, Malveaux and Senior Judge Annunziata
Argued at Fredericksburg, Virginia


PABLO JESUS LIJERON
                                                    MEMORANDUM OPINION* BY
v.        Record No. 1344-16-4               JUDGE MARY BENNETT MALVEAUX
                                                    SEPTEMBER 5, 2017
CHRISTIAN PAOLA LIJERON


FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
Charles J. Maxfield, Judge Designate

Luis A. Perez (Luis A. Perez, P.C., on briefs), for appellant.

Eric E. Clingan (The NoVa Law Firm, on brief), for appellee.


Pablo Lijeron ("father") appeals from an order granting his wife, Christian Paola Lijeron

("mother"), primary physical custody of their daughter.  Father contends that the circuit court's

custody determination was inconsistent with the evidence, the court's own factual findings, and the

statutory factors enumerated within the Code of Virginia.  We disagree and affirm.

I.  BACKGROUND

Mother and father have one daughter, B., who was born in May 2012.  Around that time,

the couple moved in with father's parents for financial reasons and for childcare assistance.  The

five Lijerons resided together in a three-bedroom townhouse in Alexandria, Virginia.

Eventually, father's relationship with mother soured, and the two separated.  Mother moved into

the townhouse's finished basement while father and B. continued to reside upstairs with his

parents.

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

In April 2015, mother told father that she intended to take B. to Kansas to visit a family member. During mother's trip, father called and texted her several times, asking to speak with B. When mother did not let father speak with their daughter, father became suspicious. He eventually went to the airport to intercept mother's return flight. Though mother disembarked from the plane, B. did not.

Mother later acknowledged that she had not visited family in Kansas with B. but instead travelled to Florida alone. She admitted that she lied to father about B.'s whereabouts.

By May 2015, father was concerned that mother might try to take B. and hide her. To prevent this concern from materializing, he filed a custody petition in the Juvenile and Domestic Relations District Court for Fairfax County ("J&DR court") on May 6, 2015. Simultaneously, he filed a motion to prevent either mother or himself from removing B. from the residence.

Mother received personal service of the custody petition and motion on May 14; about five days later, however, she sent father a text message informing him that she had already signed a lease for a new residence on May 2. She stated in the message that she intended to move out of the Alexandria townhouse with B. at the end of the month. On May 20, she sent father a message informing him that as of May 2, she and B. officially resided in Silver Spring, Maryland.

When mother finished removing her things from the Lijeron residence at the end of May, she and B. instead went to live with mother's aunt, Sylvia Araica, in Fredericksburg, Virginia.

In July 2015, mother filed for divorce in the Circuit Court of Fairfax County ("circuit court"). A few months later, in October 2015, the J&DR court entered an order that granted both parents joint legal custody of B. and established an alternating scheme for physical custody. Mother appealed that order to the circuit court.

In the circuit court, Araica testified that on May 1, 2015, she and mother executed a lease mother had created using another party's form. But the form they used to create the lease indicated that it last had been altered in July 2015. Neither mother nor Araica could explain how they had created a lease in May using a revision of a form that did not exist until several months later.

Mother holds both an associate's degree in pharmacy and a bachelor's degree in accounting. Her current employer, a certified public accountant named Daniel Gilliland, testified that she currently works as a receptionist and office manager. Mother told the court that she plans to begin applying for positions as an accountant in the future.

Father, meanwhile, had recently begun a new job as a salesperson at a local bank branch. He acknowledged that this particular branch is open seven days a week, and because he does not have full control over his schedule, he must remain available to work Saturdays and Sundays. During weekdays, father returns home around 7:45 or 8:00 p.m. When he works Saturdays, he returns at around 6:00 p.m. On Sundays, he returns at around 4:30 p.m.

Father admitted that he had been fired from his previous job as a head teller at another bank. B. was enrolled in father's health insurance plan through this prior employer. Because father failed for several weeks to tell mother he had lost his insurance, she had to transfer B. to her own healthcare plan using back-dated paperwork.

Although father still resided with his parents as of the date of the custody hearing, B.'s paternal grandmother is often out of the house because she works two jobs. She works full-time as a nurse from 2:00 p.m. until 10:30 p.m. She then sometimes travels directly to her second, part-time job, where she works until 2:00 or 3:00 a.m. She acknowledged that she sometimes does not return home until 6:00 a.m.

B.'s paternal grandfather works occasionally in construction. A native of Bolivia, he travels back to that country for infrequent visits; however, when he does so, he remains abroad for months at a time.

Mother testified that she consistently invited father to B.'s extracurricular activities, offered him extra days to spend with B., and involved him in their daughter's medical appointments. She also testified that she could foresee no problem with alternating physical custody with father each week if he moved to Fredericksburg.

At the same time, mother faulted father for failing to bathe B. and for not administering her medications as directed by her physician.

According to mother, B. is generally healthy but regularly needs medication to control her allergies; however, she testified that father forgot to send B.'s medication home with her on one occasion. When father realized his mistake, he offered to take the medication to mother during his lunch break. Mother said that she would not wait for lunch because she already had an appointment in Fredericksburg. And even though she was already in Tyson's Corner at the time, she was not willing to go by his parents' home in Alexandria to collect the medication before continuing to Fredericksburg. She explained that because father "caused this inconvenience . . . he needed to find a way to get [B.] the medication."

Mother also testified that after spending one afternoon with father, B. returned home with unexplained bruises on her back and knee. Although mother said she was concerned for her daughter and wanted to know how the bruises occurred, she never asked father about the bruises. Mother explained that she did not ask father about the bruises because he would have caused "drama." Rather than speaking with father, she instead called her pediatrician to describe the bruises over the phone and then called Anne Devine, a clinician whom she had contacted to provide individual therapy sessions for B.

At the conclusion of the evidence, the circuit court made a number of factual findings related to each of the "best interests" factors enumerated in Code § 20-124.3. The court first found that B. is thriving but that her parents' quarrelling might have negative long-term effects on her well-being. Though it found that both parents were "trying real hard" in their relationship with B., the court noted that an acrimonious divorce would necessarily disrupt their daughter's sense of security. While the court noted that its ruling would tend to define each parent's role in B.'s future upbringing, it cautioned both parents to remain involved.

When addressing mother's propensity to actively support B.'s contact with father, the court found that mother initially took B. and denied father access to her. The court noted, however, that little evidence suggested that mother had persisted in that conduct after the J&DR court entered its initial custody order.

When discussing the parents' ability to cooperate and resolve disputes, the court highlighted mother's rigidity when father forgot to send B.'s medication home with her. The court stated that mother's decision to take B. to a psychologist instead of speaking with father after discovering B.'s unexplained bruises was "even worse" than the medication issue. The court concluded from these events that mother was more focused on developing evidence against father than on caring for her child.

After noting that neither B.'s personal preference nor any history of abuse was at issue, the court proceeded to consider four additional factors it deemed important.

First, the court expressed its concern over mother's honesty, observing that she had lied about a number of facts, including her lease and her April 2015 trip.

Second, the court observed that mother had a temper. The judge warned mother to keep her temper in check so that B. would not emulate that trait.

Third, the court addressed each parent's maturity and capacity to raise a child. The court emphasized that father is thirty-seven years old but continues to live with his parents, which the court believed to reflect negatively on both his "maturity" and his "ability to raise a child." By contrast, the court noted with approval that mother had earned two college degrees. The court observed that mother's pursuit of higher education "show[ed] somebody is thinking about their future" and that a child's future is tied to her parents'.

Finally, the court found that mother's willingness to share B. if practicable weighed in favor of awarding her custody. The court noted with approval that she had testified she was willing to share physical custody if father moved to the Fredericksburg area.

Based on these considerations, the circuit court awarded both parents joint legal custody of B. but awarded primary physical custody to mother, subject to father's visitation rights. In his objections to this order, father asserted that the court's ruling was inconsistent with its own factual findings. He also contended any finding that he lacked economic independence was not supported by the evidence.

## II. ANALYSIS

Our circuit courts often must undertake the complicated task of deciding how to apportion a child's custody among two parties. In such circumstances, determining what promotes the child's best interests is a difficult and fact-intensive inquiry over which a trial court exercises "broad discretion." Brown v. Brown, 30 Va. App. 532, 538, 518 S.E.2d 336, 338 (1999).

Our task is to determine whether the circuit court has abused that discretion or otherwise relied upon findings of fact that are not supported by the evidence. "A trial court's determination of a child's best interests 'is reversible on appeal only for an abuse of . . . discretion, and a trial court's decision will not be set aside unless plainly wrong or without evidence to support it.'"

Rubino v. Rubino, 64 Va. App. 256, 261-62, 767 S.E.2d 260, 263 (2015) (quoting Farley v. Farley, 9 Va. App. 326, 327-28, 387 S.E.2d 794, 795 (1990)). "On appeal, the judgment of the circuit court is presumed to be correct." Id. at 262, 767 S.E.2d at 263. "When a trial court hears evidence *ore tenus*, its findings are entitled to the weight of a jury verdict," Floyd v. Floyd, 1 Va. App. 42, 45, 333 S.E.2d 364, 366 (1985), and we must defer to those findings. We "view the evidence in the light most favorable to the prevailing party, granting it the benefit of any reasonable inferences." Congdon v. Congdon, 40 Va. App. 255, 258, 578 S.E.2d 833, 834 (2003).

A. Abuse of Discretion

Father argues that the court abused its discretion by failing to consider where he and mother each work and by improperly considering his maturity and economic independence. He also asserts that the court's determination of B.'s best interests was contrary to the evidence and many of the court's own factual findings. We disagree with each of his arguments.

"In determining custody, the court shall give primary consideration to the best interests of the child." Code § 20-124.2(B). When determining a child's best interests "for purposes of determining custody or visitation arrangements," a court must consider nine mandatory factors. See generally Code § 20-124.3. Additionally, the court may consider "[s]uch other factors as the court deems necessary and proper to the determination." Code § 20-124.3(10).

After considering these factors, the court "shall communicate to the parties the basis of the decision" and "shall set forth the judge's findings regarding the relevant factors." Code § 20-124.3. The court is not required, however, "to quantify or elaborate exactly what weight or consideration it has given to each of the statutory factors." Brown, 30 Va. App. at 538, 518 S.E.2d at 338 (quoting Sargent v. Sargent, 20 Va. App. 694, 702, 460 S.E.2d 596, 599 (1995)).

- 7 -

Nor does the Code require "specific findings as to each statutory factor." Piatt v. Piatt, 27

Va. App. 426, 434, 499 S.E.2d 567, 571 (1998).

Our Supreme Court has described three general circumstances that can lead to an abuse

of discretion:

> An abuse of discretion . . . can occur in three principal ways:
> [first,] when a relevant factor that should have been given
> significant weight is not considered; [second,] when an irrelevant
> or improper factor is considered and given significant weight; and
> [third,] when all proper factors, and no improper ones, are
> considered, but the court, in weighing those factors, commits a
> clear error of judgment.

Landrum v. Chippenham & Johnston-Willis Hosps., Inc., 282 Va. 346, 352, 717 S.E.2d 134, 137

(2011) (quoting Kern v. TXO Prod. Corp., 738 F.2d 968, 970 (8th Cir. 1984)).

Father first argues that the circuit court abused its discretion in failing to address the fact

that he and mother work closer to his parents' home, where he lives. Thus, he contends it would

be easier for both parents to visit B. if the court awarded him custody, thereby "assur[ing]" B.'s

"frequent and continuing contact with both parents." Code § 20-124.2(B).

The circuit court's role was to determine which parent would be a better custodian for B.

by taking into consideration the statutory factors and any "other factors . . . the court deems

necessary and proper to the determination." Code § 20-124.3(10). The court expressly

addressed each of the factors contained in Code § 20-124.3 and additional factors that it found

relevant to its decision. After considering these factors, the court determined that mother was a

more suitable custodian. We cannot say that after reaching this determination, the court

nevertheless was required to consider if it should have awarded father custody instead based on

logistics.

Father next contends that his maturity and economic independence was an "irrelevant or

improper factor." We will not consider this specific assertion, however, because father has not

supported it with legal argument.  See Rule 5A:20(e).  Though he asserts that this factor was improper, he argues on brief only that "[t]he court apparently weighted this factor based on emotional or sentimental grounds."  Even if true,[1] this would prove, at most, that the court considered an otherwise appropriate factor in an improper manner.  And that is not the same as showing that the factor itself was irrelevant or improper.  Cf. Rubino, 64 Va. App. at 263-65, 767 S.E.2d at 263-65 (holding that the court committed an error of law when it used Code § 20-124.3(10) to consider an otherwise inapplicable statute during a custody determination); Cloutier v. Queen, 35 Va. App. 413, 430, 545 S.E.2d 574, 582-83 (2001) (rejecting another jurisdiction's "unity of interests" approach and holding that courts may not consider a parent's interest unless the child derives an independent benefit).

Father's failure to argue this second point is significant because it "leaves us without a legal prism through which to view his alleged error."  Bartley v. Commonwealth, 67 Va. App. 740, 746, 800 S.E.2d 199, 202 (2017).  We therefore will not assume the burden of fashioning an appropriate argument for him.

We finally disagree with father's argument that the circuit court's ruling was inconsistent with the evidence and its own factual findings.  Father notes the court found that mother had withheld B. from father at times, had failed to cooperate with him on issues concerning B., had been dishonest, and had a strong temper; in light of these findings and the evidence, father argues, the court's ruling was clearly wrong.

Again, we note that the circuit court fully explained its ruling regarding primary custody, discussing each statutory factor and other factors it found relevant.  Although the court did

---

[1] We note that the mere fact that the judge may have exhibited an emotional response to the evidence is not, by itself, sufficient to demonstrate an abuse of discretion.  "It is not required nor desired that judges of the Commonwealth possess the ability to utterly set aside all human emotion while discharging their duties."  Prieto v. Commonwealth, 283 Va. 149, 165, 721 S.E.2d 484, 494 (2012).

highlight some factors that reflected negatively on mother as B.'s primary custodian, it also expressly found that her ability and willingness to share B. if practicable weighed in favor of awarding her custody. Additionally, other evidence not expressly mentioned by the trial court also supports a reasonable inference that mother's more consistent work schedule would make her a preferable custodian on a daily basis. Father had to remain available for work on weekends. Though father lives with his own parents, they are not always available to care for B. in his absence. The court reasonably could have determined from this evidence that B. would receive more consistent care from her immediate family by awarding primary physical custody to her mother.

The overarching theme of father's argument is that the circuit court should not have "rewarded" mother with physical custody of B. after finding that she had committed so many acts of misconduct. But our Supreme Court long has held that "[t]he custody of minor children . . . is never to be given to one parent to punish the other." Rowlee v. Rowlee, 211 Va. 689, 690, 179 S.E.2d 461, 462 (1971). Rather, Code § 20-124.2(B) required the court to place B.'s best interests ahead of any other consideration. And in determining B.'s best interests, the court expressly considered all of the factors required under Code § 20-124.3 as well as those additional factors it deemed relevant.

In short, father has not demonstrated an abuse of discretion in the court's custody ruling.

B. Evidence Regarding Father's Maturity and Economic Independence

In his second assignment of error, father argues that the evidence was not sufficient to support the court's finding that he lacked the maturity and economic independence necessary to be his daughter's primary custodian. We find no merit in this contention.

Contrary to father's assertion, testimony did establish that he initially moved back in with his parents for financial reasons, at least in part. When questioned by the court, father admitted

that one of his reasons for moving in with his parents was that mother's hours at work had been reduced:

> THE COURT: And you live, essentially, with [your parents] since high school?
>
> [FATHER]: No. No, I didn't.
>
> THE COURT: When you got married you lived there, though?
>
> [FATHER]: No, we had our own place. We moved when [B.] was ready to be born.
>
> THE COURT: And that's for child care, primarily?
>
> [FATHER]: It was for child care and also [because] my wife had problems with her job. She worked for this man who owns the building, and [he] was giving her – he cut her hours, which forced us to move. [B.] was coming so we thought it was best.

Other facts in the record also were relevant to father's maturity and economic independence. By his own admission, father had recently been fired from his previous job at the time of the December 2015 hearing. Because B. had been a beneficiary on that employer's health insurance plan, the loss of father's job directly impacted her own insurance status. Nevertheless, father failed to alert mother about this problem for several weeks. Mother was able to add B. to her own insurance plan only by back-dating her paperwork. The court could have found this especially concerning in light of the fact that B. takes prescription medication for apparently severe allergies.

We conclude that the trial court's finding that father lacked maturity and economic independence was neither plainly wrong nor without evidence to support it.

### C. Appellate Attorney's Fees

Mother separately requests an award of attorney's fees and costs incurred by father's appeal. Generally speaking, an award of appellate fees and costs is appropriate only when the appeal is "frivolous" or if either party "generated unnecessary delay or expense in pursuit of its

- 11 -

interests." Tyszcenko v. Donatelli, 53 Va. App. 209, 225, 670 S.E.2d 49, 57 (2008) (first

quoting O'Loughlin v. O'Loughlin, 23 Va. App. 690, 695, 479 S.E.2d 98, 100 (1996); and then

quoting Est. of Hackler v. Hackler, 44 Va. App. 51, 75, 602 S.E.2d 426, 438 (2004)).

While father has not prevailed on the merits, we are satisfied that he presented an

"appropriate and substantial issue[]" for appellate review. Id. (quoting Hackler, 44 Va. App. at

75, 602 S.E.2d at 438). Thus, we decline mother's request for attorney's fees.

III. CONCLUSION

We conclude that father has not demonstrated an abuse of discretion in the circuit court's

custody ruling, and the court's factual findings were neither plainly wrong nor without

evidentiary support. We therefore affirm the court's award of primary physical custody to

mother and deny mother's request for appellate attorney's fees.

Affirmed.